**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JERRY JOHNSON and BIANCA JOHNSON, Individually and as Parents and Natural Guardians of JJ., a Minor, | : |
| *Plaintiffs,* | : CIVIL ACTION |
| v. | : NO.: ________________________ |
| LA ACADEMIA PARTNERSHIP CHARTER SCHOOL; CLARINA RODRIGUEZ, Individually and in Her Official Capacity as Former Principal; KENDRA MELENDEZ, Individually and in Her Official Capacity as Former Director of Special Education; MARK SIMMS, Individually and in His Former Official Capacity as CEO; and AIDALIS LOPEZ, Individually and in Her Official Capacity as Director of Operations, | : JURY TRIAL DEMANDED |
| *Defendants.* | : |

**CIVIL ACTION COMPLAINT**

Plaintiffs Jerry Johnson and Bianca Johnson, individually and as parents and natural guardians of their minor son, "JJ", by and through their attorneys, Garen Meguerian, Attorney at Law, LLC, and Zeff Law Firm, LLC, file this Complaint and allege as follows:

**I. JURISDICTION AND VENUE**

1. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

2. This Court has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## II. PARTIES

4. Plaintiff Jerry Johnson is an adult individual residing in Lancaster County, Pennsylvania. He is the father of J. Johnson.

5. Plaintiff Bianca Johnson is an adult individual residing in Lancaster County, Pennsylvania. She is the mother of JJ.

6. Plaintiff JJ is a minor child who, at all times relevant hereto, was a student at La Academia Partnership Charter School. He brings this action through his parents and natural guardians.

7. Defendant La Academia Partnership Charter School ("La Academia") is a charter school authorized by the School District of Lancaster, located at 30 North Ann Street, Lancaster, Pennsylvania 17602. La Academia receives federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964. The student body is approximately 96% Hispanic.

8. Defendant Clarina Rodriguez ("Rodriguez") served as Principal of La Academia at all times relevant hereto. She has since resigned. She is sued individually and in her former official capacity. At all times relevant hereto, she acted under color of state law.

9. Defendant Kendra Melendez ("Melendez") served as Director of Special Education and Student Services Coordinator at La Academia at all times relevant hereto. She has since resigned. She is sued individually and in her former official capacity. At all times relevant hereto, she acted under color of state law.

10. Defendant Mark Simms ("Simms") served as Chief Executive Officer of La Academia at all times relevant hereto. He was terminated by the Board of Trustees following the events described herein. He is sued individually and in his former official capacity. At all times relevant hereto, he acted under color of state law.

11. Defendant Aidalis Lopez ("Lopez") serves as Director of Operations at La Academia. She is the grandmother of one of three students who led racial slur chants against a Black teacher. She is sued individually and in her official capacity. At all times relevant hereto, she acted under color of state law.

## III. FACTUAL ALLEGATIONS

### A. Pervasive Racial Harassment of Black Students and Staff

12. At all times relevant hereto, Black students and staff at La Academia were subjected to a pervasive pattern of racial harassment, discrimination, and race-motivated violence that the School's leadership was aware of and deliberately failed to address.

13. Students routinely and openly used racial slurs, including the N-word, directed at Black students and staff on a daily basis, in classrooms and common areas, in the presence of teachers and staff, without meaningful consequence.

14. Claire Stevens, a classroom aide, has confirmed that such language occurs frequently and has become normalized.

15. Jason Cavell, a teacher with five years at the School, has described his shock upon first encountering the open use of racial slurs without consequence, stating that it is "demeaning and hostile" and "used as a weapon against Black students."

16. In JJ's algebra class, students "Z" and "C"[1] repeatedly called him the N-word and made comments such as "that's why you're Black" and "that's why you can't do [this or that]." The teacher's response was limited to saying "I heard that," without consequence.

---

[1] All names of minors have been abbreviated. Plaintiffs will disclose these minors' full known names to Defendants pursuant in discovery.

17. Student "KJ" reported students freely using the N-word and homophobic slurs in multiple classes while teachers did not intervene. Another student made racially demeaning comments about KJ's skin color, stating "you were in the oven longer." No consequences were given.

18. Student "TO" reported being called the N-word and "jigaboo" without consequences, and students making monkey noises at him. Another student threw paper balls at a Black teacher and told him to "pick it up like cotton."

19. Sharon Walker, a Science teacher, was subjected to repeated racial harassment by students in her classroom. A group of three 9th-grade students including "M" (the grandchild of Defendant Lopez), "J" (Hispanic), and "B" (White), led chants of the N-word directed at Walker during class. Other students joined in due to peer pressure. Students also told Walker to "go back where you came from" and stole her personal items from her classroom.

20. Walker reported the harassment to Defendants Rodriguez, Melendez, and Simms. Rodriguez promised a meeting that never took place. Melendez cited the IEP classification of at least one offender as a reason not to discipline. Simms acknowledged the difficulty of the environment, told Walker to "hang in there," and never took corrective action.

21. Walker resigned in or about December 2025 and submitted a written resignation letter describing the racial environment. The letter was sent to Defendants Rodriguez, Lopez, and Simms, and was provided to the Board of Trustees.

22. Walker also personally witnessed students calling Mr. McCloud, a Black male teacher, a "black monkey." The School took no corrective action.

23. In other separate incidents, a young Black female student was told by a Hispanic male student, "I'm going to skin you [derogatory expletive]." That student engaged in stalking

behavior and was charged with misdemeanor stalking. The School's response to the victim was to advise her to "just ignore him." Board Chair Chris Boyd personally witnessed this incident during his first week of active involvement at the School

**B. Board-Level Knowledge**

24. Chris Boyd, the former Chair of the Board of Trustees, received frequent complaints regarding racial incidents during his tenure. He exchanged written communications with CEO Simms acknowledging the severity of racial discrimination at the School.

25. In February 2026, one month before the assault on Plaintiff JJ, Boyd held a town hall meeting at which community members expressed widespread concern about the use of the N-word and the leadership's failure to address it. Meeting notes were taken by Melissa Binder.

26. Boyd personally witnessed racial harassment at the School during his first week of active involvement, including students openly using the N-word in the hallway in the presence of Lopez. He directed Lopez to address it. Lopez declined to discipline any of the students.

27. Despite actual knowledge at the highest levels of governance, the School took no meaningful corrective action.

**C. Failure to Train, Document, and Supervise**

28. La Academia never provided anti-discrimination or anti-harassment training to students or staff at any time prior to the assault on JJ. Every witness, Walker, Cavell, Stevens, and Boyd, confirms the complete absence of such training.

29. Cavell stated that the School provided emergency and physical restraint training but no training for the pervasive racial harassment that staff observed regularly.

30. La Academia maintained a system called Power School intended to document all incidents, but failed to direct staff to use it. Incidents of racial harassment went systematically undocumented.

31. The School's first-ever anti-discrimination training was scheduled for August 12, 2026, after the assault, after Plaintiffs' demand letter, and after all witness declarations were obtained, and was presented by the Pennsylvania Human Relations Commission.

**D. X. E.'s Known Violent Propensities**

32. "XE" is a student at La Academia.

33. Upon information and belief, XE displays behaviors consistent with autism spectrum disorder. Multiple teachers, including Walker and Cavell, observed these behaviors in the classroom. Walker has described specific behavioral patterns: XE would become upset if attention was directed to other students, required constant engagement, and would act out if ignored even briefly.

34. Despite these known behavioral challenges, the School's Director of Special Education, Defendant Melendez, never initiated an evaluation of XE or developed a behavioral intervention plan, as required by the IDEA's Child Find mandate.

35. On Thursday, March 5, 2026, the day before the assault on JJ, XE stabbed another student, E., in the hand with a pen. The School was aware of this incident. Despite this knowledge, XE was permitted to return to school and remain in the general classroom population on March 6, 2026, without any safety measures, monitoring, or behavioral intervention.

**E. The Assault on JJ**

36. On Friday, March 6, 2026, during fourth period, JJ was in Mr. Darbouze Maxime's Introduction to Physics/Chemistry class. Approximately 14–17 students were present, along with two school employees: Mr. Maxime and classroom aide Claire Stevens.

37. Neither Principal Rodriguez nor CEO Simms was on campus that day.

38. Plaintiff JJ approached the teacher to ask about an alternative assignment method. XA was nearby attempting to hand a paper to the teacher. The two students arrived at the teacher's desk at the same time. JJ did not touch XA's paper. Multiple witnesses, including the teacher, confirm this.

39. Without provocation, XA turned to Plaintiff JJ and screamed, "I'm going to kill you, Nigger!"

40. Plaintiff JJ attempted to de-escalate by walking away and returning to his seat. XA continued to repeat the threat.

41. XA repeatedly stabbed Plaintiff JJ in the face and head with a thick, multicolored pen. Student eyewitness "JM" has stated under oath that "he repeatedly stabbed [JJ] in the face" and that "[XA] kept stabbing at [JJ]'s face." JM described "multiple scratches and marks on his face" after the assault.

42. Stevens physically intervened, separating the students and removing JJ from the classroom. Mr. Maxime took the pen from XA's hand.

43. Plaintiff JJ sustained a puncture wound to his forehead approximately one inch above his left eye. He was bleeding. Stevens treated the wound with gauze and bandages from the supervisor's office because no nurse was available. JJ said: "What just happened? That's crazy. It could have been my eye!" The wound has resulted in residual facial scarring.

44. Plaintiff JJ did not retaliate despite being repeatedly stabbed in the face.

45. Some students protested XA's return to school. They demonstrated in the hallway, demanding that XA be removed because they were afraid of him. The administration did not respond to the protest.

**F. The School's Deliberately Indifferent Response**

46. **Failure to Notify Parents.** La Academia did not notify Bianca Johnson that her son had been stabbed at school. Mrs. Johnson learned about the assault from JM, a fifteen-year-old student, at JJ's basketball game that evening. As of March 12, 2026, the School had still not communicated with the family. The School later acknowledged to Mr. Johnson that it "made a mistake."

47. **Failure to Contact Law Enforcement.** The School did not file a police report or contact law enforcement. The Johnson family was forced to file the report themselves.

48. **Grossly Disproportionate Discipline.** XA received a suspension of approximately one to one and one-half days before returning to school. The School's own disciplinary code provides for a minimum three-day suspension. By comparison, two female students who fought on a school bus were suspended for five days. XA's discipline for a racially motivated stabbing was a fraction of what was imposed for a non-racial physical altercation.

49. **Failure to Implement Safety Measures.** No separation order, no-contact directive, or safety protocol was communicated to the family or implemented.

50. **No Follow-Up.** The School made no effort to check on J.'s condition or address the seriousness of the assault with the family.

51. On March 12, 2026, Mrs. Johnson sent a written letter demanding answers regarding notification, law enforcement, discipline, and safety measures. The School failed to provide a substantive response.

52. As a direct result of the School's failure to ensure his safety, J. was removed from school by his parents and forced to complete schoolwork remotely.

### G. Defendant Lopez's Conflicts of Interest

53. Defendant Lopez is also the grandmother of Mason, one of the three students identified as leading the racial slur chants directed at teacher Sharon Walker.

54. When contacted by Walker after the assault on JJ, Lopez described the stabbing as "only a scratch" and questioned why Jerry Johnson was concerned about the incident.

55. Defendant Lopez's familial connections to one of the primary racial harassers created a disqualifying conflict of interest that compromised the School's ability to investigate and respond to racial harassment impartially.

56. Following the assault, Defendant Lopez told Board Chair Chris Boyd words to the effect that if Jerry Johnson pursued legal claims, Boyd could no longer communicate with him. This directive, issued by the School's Director of Operations to the Chair of the Board, demonstrates Lopez's active role in managing the School's response to the Johnson family's advocacy and her intent to suppress internal accountability.

### H. Termination of CEO Simms

57. Following the assault, the Board terminated Simms. Boyd has confirmed that the Board removed Simms because of concern about legal liability.

58. Defendant Simms had mischaracterized the assault to Boyd as a pen being "thrown at" a student, understating the severity.

59. The School's attorney was instructed to "keep it vague" regarding Defendant Simms's departure. Simms was offered favorable separation terms.

### I. Harm to J. and His Family

60. As a direct and proximate result of the assault and the School's deliberately indifferent response, JJ has suffered physical injury (puncture wound to the face with residual scarring), severe emotional and psychological distress, and denial of equal access to education.

61. Jerry and Bianca Johnson have suffered severe emotional distress.

## IV. CAUSES OF ACTION

### COUNT I

**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**
**(Against La Academia)**

62. Plaintiffs incorporate all preceding paragraphs.

63. La Academia receives federal financial assistance. JJ is a member of a protected class.

64. JJ was subjected to racial harassment so severe, pervasive, and objectively offensive that it denied him equal access to education.

65. La Academia had actual knowledge through multiple channels: the Board Chair, the CEO, the town hall, Walker's resignation, prior racial violence incidents, and the assault itself being witnessed by two employees.

66. The School's response was clearly unreasonable. The harassment occurred on school grounds during school hours.

67. As a direct result, JJ suffered physical injury, emotional distress, and denial of educational access.

### COUNT II

**42 U.S.C. § 1983 — Equal Protection and § 1981**
**(Against Rodriguez, Melendez, Simms, and Lopez, Individually)**

68. Plaintiffs incorporate all preceding paragraphs.

69. Each individual Defendant was a state actor acting under color of state law.

70. **Rodriguez:** Knew of daily racial slurs in classrooms under her supervision. Promised Walker a meeting that never happened. Failed to take corrective action after Walker's resignation. Failed to ensure adequate discipline for X.A. after his prior-day stabbing. After the assault, the discipline imposed fell below the School's own minimum. She texted Walker on April 13, 2026 to apologize, acknowledging the failures.

71. **Melendez:** Received reports of racial harassment. Used IEP status as an excuse not to discipline. As Director of Special Education, failed to evaluate X.A. despite known behavioral concerns. After the assault, confirmed JJ "did nothing wrong but got stabbed in the head" yet took no corrective action.

72. **Simms:** Exchanged written communications with Boyd acknowledging discrimination. Was CEO during the town hall, Walker's resignation, and prior racial violence. Told Walker to "hang in there" but never acted. Trivialized X.A.'s violence by calling him the "nutty professor." Mischaracterized the assault to the Board Chair. Terminated for his failures.

73. **Lopez:** Grandmother of M. (one of Walker's harassers). Directed by Boyd to address racial slurs in the hallway but took no disciplinary action. She described the stabbing as "only a scratch." Her familial conflicts compromised every institutional response to racial harassment.

74. Each Defendant's conduct constitutes purposeful discrimination on the basis of race in violation of the Equal Protection Clause and § 1981.

75. As a direct result, JJ suffered physical injury, emotional distress, and denial of educational access.

**COUNT III**

**42 U.S.C. § 1983 — Monell Municipal Liability**

**(Against La Academia)**

76. Plaintiffs incorporate all preceding paragraphs.

77. **Custom and Practice:** La Academia maintained a permanent, well-settled custom of tolerating racial harassment. Racial slurs were used daily without consequence. Multiple witnesses across years confirm this pattern.

78. **Policymaker Knowledge and Ratification:** The Board Chair and CEO had actual knowledge through written communications, the February 2026 town hall, Walker's resignation, and prior incidents. The Board's termination of Simms with instructions to "keep it vague" constitutes ratification.

79. **Failure to Train:** No anti-discrimination training was ever provided. Policymakers knew employees would confront racial harassment. The predictable consequence was inadequate responses to racial violence.

80. **Failure to Evaluate and Supervise:** The School failed to evaluate XA for special education services despite known behavioral concerns, failed to use Power School to document incidents, and failed to supervise administrators who were personally conflicted.

81. These customs, policies, and failures were the moving force behind the violations of J.'s constitutional rights.

**COUNT IV**

**42 U.S.C. § 1983 — Fourteenth Amendment Substantive Due Process**

**State-Created Danger**

**(Against Rodriguez, Melendez, Simms, and Lopez, Individually)**

82. Plaintiffs incorporate all preceding paragraphs.

83. **Foreseeability:** XA stabbed another student the day before. He had known behavioral challenges consistent with autism spectrum disorder that the School failed to evaluate or address. The School knew of pervasive racial violence. Each individual Defendant had specific knowledge of the risk.

84. **Conscience-Shocking Conduct:** Permitting a student who stabbed someone the day before, with known undiagnosed behavioral challenges, to return to a classroom without safety measures, in a school permeated by unchecked racial hostility, shocks the conscience.

85. **Foreseeable Victim:** JJ was a member of a discrete class: Black students who were known targets of racial harassment. He had personally been subjected to repeated racial slurs without consequence.

86. **Affirmative Act:** The decision to return XA to the classroom after the March 5 stabbing without safety measures was an affirmative exercise of authority that created the danger. Melendez's failure to evaluate XA was a deliberate omission by the person responsible for special education services.

87. JJ suffered physical injury, including a puncture wound with residual scarring, satisfying the harm requirement beyond emotional distress.

**COUNT V**
**Negligence and/or Recklessness**
**(Against All Defendants)**

88. Plaintiffs incorporate all preceding paragraphs.

89. Defendants owed JJ a duty of care. They breached that duty through the conduct described herein. Their conduct was reckless, willful, and wanton. JJ suffered damages as a direct result.

90. To the extent La Academia claims sovereign immunity under 42 Pa.C.S. § 8541, Plaintiffs reserve all arguments regarding statutory exceptions.

**COUNT VI**
**Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

91. Plaintiffs incorporate all preceding paragraphs.

92. Defendants' conduct was extreme and outrageous, going beyond all bounds of decency. Defendants knew a student who stabbed someone the day before remained in the classroom. When JJ was stabbed while being called the N-word and threatened with death, the School failed to notify his parents, failed to call the police, imposed minimal discipline, and communicated nothing to the family.

93. Plaintiffs Jerry Johnson, Bianca Johnson, and JJ suffered severe emotional distress.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against all Defendants and the following relief:

(a) Compensatory damages for physical injury, emotional distress, denial of educational access, and loss of enjoyment of life;

(b) Punitive damages against the individual Defendants;

(c) Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

(d) Pre-judgment and post-judgment interest;

(e) Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,



2026.09.24
09:20:28 -04'00'

______________________________

Garen Meguerian, Esquire
PA ID No. _______________
Garen Meguerian, Attorney at Law, LLC
21 Industrial Boulevard, Suite 201
Paoli, Pennsylvania 19301
(610) 550-8042 | gm@garenmlaw.com

Gregg Zeff, Esquire
Zeff Law Firm, LLC
100 Century Parkway, Suite 160
Mt. Laurel, New Jersey 08054
(856) 778-9700

*Attorneys for Plaintiffs*
Dated: __________________, 2026